# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| RICHARD KENDZION, | ) | |
| | ) | |
| Plaintiff, | ) | No. 13 C 4820 |
| | ) | |
| v. | ) | Magistrate Judge Cole |
| | ) | |
| CAROLYN W. COLVIN, Commissioner of Social Security, | ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Richard Kendzion seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. Act, 42 U.S.C. § 1382c(a)(3)(A). Mr. Kendzion asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.

## PROCEDURAL HISTORY

Mr. Kendzion applied for SSI on November 10, 2010, alleging that he had become disabled on December 1, 2009, due to arthritis in his spine and a learning disability. (Administrative Record ("R.") 119, 143). His application was denied initially and upon reconsideration (R. 51-52, 67-71), and Mr. Kendzion continued pursuit of his claim by filing a timely request for a hearing. An administrative law judge ("ALJ") convened a hearing at which Mr. Kendzion, represented by counsel, appeared and testified. In addition, James Radke testified as a vocational expert. (R. 27-49). On February 22, 2012, the ALJ issued a decision finding that Mr. Kendzion was not disabled

because he could perform medium work that did not involve any climbing of ladders, ropes, or scaffolds; more than occasional climbing of stairs and ramps, balancing, stooping, crouching, kneeling, or crawling; and that was limited to simple, routine, repetitive tasks, plus tasks learned by demonstration with no requirements for reading on the job. (R. 11-21). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Mr. Kendzion's request for review on May 7, 2013. (R. 1-6). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Kendzion has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.

## THE EVIDENCE OF RECORD

### A.

### The Vocational Evidence

Mr. Kendzion was born on September 19, 1956, making him fifty-five years old at the time of the ALJ's decision. (R. 158). He is 5'8" tall and weighs 160 pounds. (R. 143). He got no further than eighth grade in school and is illiterate. (R. 35, 178). He worked for a towing company from 2007 to 2010, but was laid off and has not been able to find work due to his illiteracy and limited intellect. (R. 36, 144). Since then he has tried to make ends meet by doing odd jobs in his neighborhood – mowing lawns, raking leaves, washing cars, etc. (R. 38, 166).

### B.

### The Medical Evidence

The evidence begins with Mr. Kendzion's grammar school records from 1970, which indicate that he had a Wechsler IQ test in August 1970 and scored a 62. (R. 189). The disability agency

2

arranged a consultative psychological examination for Mr. Kendzion with Michael Stone on January 10, 2011. Dr. Stone noted that Mr. Kendzion arrived at the exam accompanied by a friend. Mr Kendzion reported that he was taking no medication and received daily assistance from his friend in things like cooking, shopping, travel, and money management. (R. 200). Mr. Kendzion appeared mildly depressed. He had problems maintaining a consistent level of attention ad concentration throughout the exam. (R. 201). He exhibited impairment in his ability to perform simple calculations and in his fund of general knowledge. His judgment was adequate. He exhibited concrete thinking – he was unable to interpret proverbs. Dr. Stone estimated his intelligence was borderline to low average. His symptoms were indicative of adjustment disorder and his prognosis was guarded. (R. 203). He would be unable to manage any funds. (R. 203).

That same day, Dr. Rochelle Hawkins conducted a consultative physical exam. Mr. Kendzion told her he thought he had arthritis but had not seen a doctor about it. He rated his pain as 5-6 on a scale of 10. (R. 205). Upon examination, there was no limitation of motion or reduction of strength in his upper or lower extremities. Sensation was normal. He had no difficulty getting off and on the exam table, tandem walking, heel/toe walking, hopping, squatting or rising. There was no limitation of motion in the spine. (R. 206). Dr. Hawkins concluded that Mr. Kendzion was able to sit, stand, walk, lift, carry, speak, hear, without difficulty. (R.207).

Elizabeth Kuester reviewed the record on behalf of the disability agency on January 28, 2011. (R. 215). She found Mr. Kendzion moderately limited in his ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, and the ability to set realistic goals and plan without the help of others. (R. 213-14). He had mild restrictions in daily activities and social functioning and

moderate restrictions in concentration, persistence, and pace. (R. 233). Dr. Kuester opined that Mr. Kendzion could perform simple routine, tasks adequately with ordinary supervision, relate acceptably, make work decisions, and cope with work demands. (R. 215).

On March 8, 2011, Mr. Kendzion went to Stroger Hospital regarding his lower back pain. Range of motion was full, and physical examination was essentially normal. (R. 239). X-rays showed evidence of disc and facet disease: disc osteophytes, with disc narrowing at L5-S1, L1-2, and facet joint hypertrophy greatest at L5-S1. There was also spasm and mild chronic T12 compression deformity. (R. 240). Musculoskeletal exam – range of motion, strength, etc. – remained normal on June 23, 2011. (R. 244-45).

On January 27, 2012, Mr. Kendzion's attorney sent him for a psychological exam with psychologist Nicolette Puntini. He arrived with his friend, stating that he did not travel alone fearing he will get lost in unfamiliar locations. (R. 254). He said he lived with his parents until they died but could not remember when that was. (R. 255). Dr. Putini noted that he appeared to be intellectually slow. (R. 255). She performed a Wechsler Adult Intelligence Scale test. Mr. Kendzion scored 61 on verbal comprehension – worse than 99% of his peers – falling into the mentally retarded range. (R. 256-57). He scored 69 on perceptual reasoning, also in the mentally retarded range. (R. 257). His working memory score was 60, showing that his ability to sustain concentration and attention was worse than 98% of his peers. (R. 257). Processing speed was 74, which fell into the borderline range. (R. 258). His full scale IQ of 60 was worse than 98% of his peers and also in the mentally retarded range. (R. 258). The doctor concluded that Mr. Kendzion was suffering from mild mental retardation and illiteracy. (R. 259).

## C.

## The Administrative Hearing Testimony

### 1.

### The Plaintiff's Testimony

At his hearing, Mr. Kendzion testified that he was 55 years old. He couldn't remember where he lived – it was "like a house . . . like a big apartment building." He lived with his friend, Herm. (R. 32). He explained that he worked for Airline Towing as a janitor for four years before he got fired. They blamed him for stealing stuff out of the cars, but he never did. (R. 33). Mr. Kendzion said he hadn't worked before Airline Towing because no one would hire him due to his limited intellect and illiteracy. (R. 35). He quit school after eighth grade because of gangs in the high school. (R. 35). He had been in special education classes until then. (R. 43).

Mr. Kendzion looked for jobs during the day but they were hard to find. He would do things for old people – little jobs here and there. (R. 38). He said he had to sit down once in a while because his legs give out. He had arthritis in his spine, and it aggravated him every day. (R. 39). He had to take breaks while walking. (R. 43). Mr. Kendzion didn't take public transportation unless someone was with him. (R. 40). He used to drink alcohol – "two bottles" a day – but quit. (R. 37).

### 2.

### The Vocational Expert's Testimony

James Radke then testified as a vocational expert. He said that Mr. Kendzion's past janitorial work was unskilled and light in exertional level. (R. 46). The ALJ asked whether a person who could perform medium work that did not involve climbing ladders, ropes, or scaffolds, or more than occasional climbing of ramps/stairs, balancing, stooping, crouching, kneeling or crawling, and was

5

limited to simple, routine tasks and tasks that could be learned by demonstration without reading could perform any of Mr. Kendzion's past work. The VE said yes, such a person could perform janitorial work. (R. 46-47). If such a person were off task consistently for more than 12 percent of the day, they would not be able to maintain employment. (R. 67).

At the close of the hearing, the ALJ told Mr. Kendzion's counsel that it was imperative that they have some up-to-date IQ testing. The only one in the record was from when Mr. Kendzion was in grammar school. The ALJ left the record open for thirty days. (R. 48-49).

**D.**

**The ALJ's Decision**

The ALJ found that Mr. Kendzion suffered from the following severe impairments: lumbar degenerative disc disease, history of learning disorder, history of alcohol dependence. (R. 13). The ALJ next determined that he did not have an impairment or combination of impairments that met or equaled a listed impairment, specifically considering listing 12.05. As there was no evidence of a valid IQ score of 60-70 attained prior to age 22 with another impairment posing work limitations or two marked difficulties in activities of daily living, social functioning, maintaining concentration, or episodes of decompensation. (R. 14). The ALJ also found that Mr. Kendzion didn't satisfy the "B" criteria of listings 12.02, 12.04, 12.09, because he had only moderate difficulties with concentration and mild difficulties with daily living and social functioning. (R. 15).

The ALJ went on to determine that Mr. Kendzion retained the capacity to medium work that did not involve climbing ladders, ropes, or scaffolds, or more than occasional climbing of ramps/stairs, balancing, stooping, crouching, kneeling or crawling, and was limited to simple, routine and repetitive tasks and tasks that could be learned by demonstration. (R. 15). The ALJ then came

6

to the prohibited conclusion – prohibited because illogical as the Seventh Circuit has explained time and again without any effect on the ALJ in this District – that Mr. Kendzion's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [his] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 16). The ALJ explained that Mr. Kendzion had not received the type of medical treatment one would expect of a totally disabled individual. There was a lack of evidence demonstrating the existence of a disabling physical or mental impairment. Specifically, there was little or no treatment for back pain (R. 17) and no actual treatment for any mental impairment. (R. 18).

The ALJ said that the report of consultative examiner, psychologist Michael Stone, was consistent with the record as a whole. The ALJ accorded some weight to the opinions of the state agency reviewers, but he felt it was appropriate to include some additional limitations, such as no on-the-job reading requirements. (R. 18). The ALJ considered the report from psychologist Nicolette Puntini, but as she gave no opinion, he used it only as clinical evidence. (R. 19). The ALJ rejected Mr. Kendzion's grammar school IQ test because there was "no evidence of an actual diagnosis, prior to age 22, and no evidence to show the full Wechsler intelligence test was administered." (R. 19). The ALJ rejected the more recent test administered by Dr. Puntini because there was "no evidence indicative that a valid IQ test was rendered and obtained prior to age 22." (R. 19). The ALJ added that claims of disability were undermined by Mr. Kendzion's ability to perform work as a janitor (R. 19), and that his daily activities were not limited to the extent one would expect given complaints of disabling symptoms and limitations. (R. 20).

The ALJ then relied upon the testimony of the vocational expert that, given a capacity for

light work with the given postural and simple work limitations, a person could perform Mr. Kendzion's past work as a janitor. Accordingly, the ALJ concluded that Mr. Kendzion was not disabled and, therefore, not entitled to disability insurance benefits. (R. 20-21).

IV.

DISCUSSION

A.

**The Standard of Review**

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is not a difficult standard to meet; it is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v.*

*Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALL's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALL's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). The Seventh Circuit also calls it a "lax" standard, *Berger*, 516 F.3d at 544.

B.

**The Five-Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

    1) is the plaintiff currently unemployed;

    2) does the plaintiff have a severe impairment;

    3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

    4) is the plaintiff unable to perform his past relevant work; and

    5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any

point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.

### Analysis

Mr. Kendzion has a number of issues with the ALJ's opinion, but we will focus on one, as it requires this matter to be remanded to the Commissioner. In his decision, the ALJ determined that Mr. Kendzion has moderate difficulties in concentration, persistence, or pace. He noted that his finding was "consistent with the observations of a consultative examiner," presumably, Dr. Stone. Dr. Stone remarked that Mr. Kendzion exhibited problems maintaining attention and concentration during his 55-minute evaluation. (R. 201). When questioning the VE at the administrative hearing, the ALJ asked him to assume an individual was limited to "simple, routine tasks, and . . . tasks that can be learned by demonstration with no requirement for reading on the job." (R. 47). The issue is: does that hypothetical account for what the ALJ conceded are Mr. Kendzion's moderate difficulties with concentration, persistence, or pace?

This is a recurring theme in Social Security disability cases with mental impairment components. An ALJ must orient a VE to all of a claimant's limitations, including deficiencies of concentration, persistence and pace. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). The Seventh Circuit has "suggested," but not ruled, that the most effective way to do that is to include such limitations specifically in the hypothetical. 627 F.3d at 619. The court has refused to "insist[], however, on a per se requirement that this specific terminology ("concentration, persistence

and pace") be used in the hypothetical in all cases." 627 F.3d at 619. And so, many ALJs – like our ALJ here – have gone on the way they always have despite having been afforded the key in *O'Connor-Spinner*.

And so, with ALJs refusing to follow the prescribed and proper path, the question invariably becomes how much the Seventh Circuit's case law lets them get away with. The court's line is a gray one, to say the least. At one point the court had to acknowledge that its conflicting rulings had left the law in a state of uncertainty. *Kusilek v. Barnhart*, 175 Fed.Appx. 68, 71 (7th Cir. 2006). Since then, cases have continued to go in a variety of directions, and as the court described in *O'Connor-Spinner,* have been highly fact-intensive and difficult to distinguish. 627 F.3d at 619.

Notably, however, in *Stewart v. Astrue,* 561 F.3d 679 (7th Cir. 2009), the court held that a hypothetical limiting a person to "simple, routine tasks that do not require constant interactions with co-workers or the general public" did not account for limitation in concentration, persistence, or pace. 561 F.3d at 684-85. That's fairly close to what the ALJ tried to do here. *See also Craft v. Astrue*, 539 F.3d 668, 677 (7th Cir. 2008)(limiting person to "simple, unskilled work" did not account for moderate difficulty with concentration); *Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir. 2003)(mentioning borderline intelligence that seriously limited the ability to understand, remember, and carry out instructions did not account for deficiencies in concentration, persistence, or pace). It would seem then, that the ALJ's hypothetical would not pass muster.

But, the Commissioner argues that the ALJ, appropriately, used alternate phrasing that specifically excluded those tasks that someone with Mr. Kendzion's limitations would be unable to perform. (Dkt. # 20, at 10-11). The Commissioner draws that language from *O'Connor-Spinner*, where the court, in the midst of wading through its varied rulings on these types of issues, said:

11

> We also have let stand an ALJ's hypothetical omitting the terms "concentration, persistence and pace" when it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform. We most often have done so when a claimant's limitations were stress- or panic-related and the hypothetical restricted the claimant to low-stress work.

627 F.3d at 619. This is not a case involving stress or panic-related limitations, however. Moreover, and more importantly, it is not "manifest" that "simple, routine tasks . . . that can be learned by demonstration" specifically exclude jobs that someone with moderate difficulties in concentration, persistence, or pace would be unable to perform.

A simple job that's not mentally challenging and is easy to learn may, nevertheless, tax someone's concentration and focus. *See Kasarsky*, 335 F.3d at 544(". . . the length of time it takes someone with borderline intelligence to learn a job is not the same as the ability of that person to perform consistently once trained."); SSR 85–15, 1985 WL 56857 (1985) ("Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's [mental] condition may make performance of an unskilled job as difficult as an objectively more demanding job."). Suppose there is a job that involves a conveyor delivering a product to a worker who must then place it in a receptacle – product after product, receptacle after receptacle, over and over, at a pace. Those of a certain age might recall the classic Lucille Ball-Vivian Vance sketch where the two were tasked with wrapping candies coming down a conveyor at a candy factory. *See* http://www.youtube.com/watch?v=8NPzLBSBzPI. The job is simple; it is repetitive; it is routine; it is easily learned by demonstration. But for one whose concentration waxes and wanes, or cannot persist or maintain a pace throughout the day, it is a daunting if not impossible occupation. This is

why a VE needs to be informed of limitations in concentration even if an ALJ has already specified a limitation to simple, repetitive work.

Now, it may well be that, if asked whether a person with moderate difficulties in concentration, persistence, or pace could perform Mr. Kendzion's past janitorial work, the VE would answer in the affirmative. But that is not the scenario that unfolded at the hearing. And so, this matter must be remanded to the Commissioner because the ALJ failed to adequately account for Mr. Kendzion's moderate difficulties in concentration, persistence, or pace in his hypothetical to the VE.

While this is sufficient to warrant a remand, other obvious problems with the aLJ's decision should be noted. The ALJ found Mr. Kendzion not credible based on the medical evidence, lack of treatment, and his ability to previously perform his janitorial job and do some odd jobs around his neighborhood. First of all, an ALJ must be careful when rejecting a claimant's claims based on the objective medical evidence and/or lack of treatment. "[A]n ALJ may not base a [credibility] decision solely on the lack of objective corroboration of complaints of pain." *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014). The ALJ had additional reasons here, but when positing a lack of medical treatment as undermining a claimant's allegations, an ALJ has to explore the reason for that lack of treatment. 739 F.3d at 1050; *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). The ALJ failed to do that in this case.

Moreover, despite the relatively brief record in this case, the ALJ made some careless misreadings or mischaracterizations of the evidence that he then used against Mr. Kendzion's credibility. For one example, the ALJ remarked that "[d]espite his testimony of needing to go everywhere accompanied, treating notes do not comment on the presence of another individual at the appointment." (R. 18). In fact, the very notes the ALJ cited – as Exhibit 1F – specifically

13

mentioned that Mr. Kendzion "arrived at the examination accompanied by a friend." (R. 200). Similarly, he was accompanied to the hearing by his friend, as well as to his psychological evaluation with Dr. Puntini. (R. 254). For another example, at one point, the ALJ states that Mr. Kendzion had alleged "complete prostration." (R. 17). That's clearly not what Mr. Kendzion has alleged and is not even consistent with the ALJ summary of Mr. Kendzion's testimony.

As the ALJ noted, contrary to his characterization of Mr. Kendzion's allegations, Mr. Kendzion does some odd jobs for a few dollars around his neighborhood. The ALJ also called attention to the fact that Mr. Kendzion had been able to perform his janitorial work despite his limited intellect. This, the ALJ said, undermined Mr. Kendzion's claim of disability and suggests he could currently work. (R. 16, 19).

But, as the Seventh Circuit has stated time and again, daily activities – like raking leaves or helping old people around on their errands – does not equate to an ability to hold down a full-time job. *See, e.g., Carradine v. Barnhart*, 360 F.3d 751, 755-56 (7th Cir. 2004)("[Claimant] does not claim to be in wracking pain every minute of the day. When she feels better for a little while, she can drive, shop, do housework. It does not follow that she can maintain concentration and effort over the full course of the work week."); *Roddy*, 705 F.3d at 639("We have repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time."); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011)(". . . we are hard-pressed to understand how Jelinek's brief, part-time employment supports a conclusion that she was able to work a full-time job, week in and week out, . . . ."). Even the fact that Mr. Kendzion was able to work as a janitor for a few years does not necessarily mean he is not disabled. *See Henderson v. Barnhart*, 349 F.3d 434, 435 (7th Cir. 2003)(".

. . the fact that a person holds down a job doesn't prove that he isn't disabled, because he may have a careless or indulgent employer or be working beyond his capacity out of desperation."); *Wilder v. Apfel*, 153 F.3d 799, 801 (7th Cir. 1998)( "employment is not proof positive of ability to work, since disabled people, if desperate (or employed by an altruist), can often hold a job.").

This is not to say that such things are irrelevant, of course, or that the cases on these points are easily harmonized. The Court of Appeals has gone the other way on the issue at least a few times. *See, e.g., Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008)("Although the diminished number of hours per week indicated that Berger was not at his best, the fact that he could perform some work cuts against his claim that he was totally disabled."); *Lott v. Colvin*, 541 Fed.Appx. 702, 706 (7th Cir. 2013)(working part-time undermined credibility); *Murphy v. Astrue*, 454 Fed.Appx. 514, 519-20 (7th Cir. 2012)(same). But, in this Circuit, at least, an ALJ should go the extra mile in building a logical bridge and offer more than a conclusory assertion that part-time work means a claimant is lying about being disabled.

One further point. The ALJ's treatment of the two IQ tests in the record – one from 1970 and one from 2012 – is confusing. At the close of the hearing, the ALJ advised counsel that Mr. Kendzion would need a more recent IQ test that the one from grammar school. One was dutifully secured, demonstrating that Mr. Kendzion's full scale IQ was 60, and that he was mentally retarded. This was essentially the same as his 1970 test, which put his IQ at 62. But the ALJ rejected both tests. He rejected the 1970 test, because there was no evidence to show a full Wechsler intelligence test was performed. (R. 19).

It's not clear what the ALJ wanted, although perhaps he was understandably suspicious of a 45-year old test performed in a grammar school. He didn't say that, however. As for the more

15

recent test – the one the ALJ demanded – he rejected that because there was "no evidence indicative that a valid IQ test was rendered and obtained prior to age 22." (R. 19). It seems one test was too old and the other too new. And, again, it was the ALJ who said a new test was needed. As far as the IQ tests were concerned, it seems that the ALJ stacked the deck against Mr. Kendzion.[1]

## CONCLUSION

The plaintiff's motion for remand [Dkt. #14] is GRANTED, and this matter is remanded to the Commissioner for further proceedings consistent with this opinion..

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 10/27/14

---

[1] The ALJ was clearly thinking of the requirements of the listing with his reference to age 22. But, the listing for mental retardation, 12.05, requires "evidence demonstrat[ing] the onset of the impairment before age 22", not a test *obtained* before age 22. But even if the ALJ had not gotten that wrong, there is no reason why the 2012 test should be rejected out of hand and not considered in the steps beyond step 3.

16